## COUCH v. BARNETT.

PATENTS; INTERFERENCE.

1. A horse-collar made from a casing cut from a single piece of material folded and stitched in a peculiar manner is one of those devices so simple in their purpose and of an efficacy so obvious that the making of one of a size and form intended for and available for practical use is a sufficient reduction to practice without actual use or test; and therefore the making of such a collar, exhibiting it to a number of persons and putting it on sale without testing it upon the neck of a harnessed animal, is a reduction to practice of the invention.

2. Where the Commissioner of Patents in an interference case held that there was no reduction to practice under such circumstances, this court reversed his decision, although it would have hesitated to disturb it had it been that such party had no conception of the invention prior to the other party and made no full-sized collar embodying it, because of the uncertainty involved in his failure to preserve the first collar made by him, his long delay in applying for a patent, and his failure under the circumstances to engage in their general manufacture for the trade.

No. 249.   Patent Appeals.   Submitted March 9, 1904.   Decided April 6, 1904.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                         *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Charles Elwood Foster* for the appellant.

*Mr. James L. Norris* and *Mr. George W. Rea* for the appel-
lee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving the invention of
a horse-collar made from a casing cut from a single piece of ma-
terial folded and stitched in a peculiar manner, as described
in the following issue:

"1. A section of a horse-collar in which a one-piece or in-
tegral blank is united by stitches to form the wales, the stitches
in the completed collar being within one of the wales.

"2. As an improved article of manufacture, a section of a
horse-collar made up from a single one-piece blank, which is con-
nected by a line or lines of stitches the stitches being located en-
tirely within one of the wales of the collar-section.

"3. A section of a horse-collar made up from a single in-
tegral blank which is connected by a line of stitching to provide
fore and after wales, the surface loops of the stitches being with-
in one of the wales and protected by overlying parts of the blank,
the same being invisible in the made-up collar-section.

"4. A section of a horse-collar consisting of a single piece of
material which is folded upon itself to provide an inturned por-
tion, the parts being united by a curved line of stitches which
connects the blank to provide fore and after wales, the material
forming the after-wales being shaped and puckered adjacent to
its larger portion to impart a curved form to such wale when
stuffed.

"5. The herein-described section of a horse-collar made from
a single piece of properly-shaped material or blank which has
within its margin a dart, the edges of the material being con-
nected by a line of stitches, one of the wales being turned so
that in the completed collar-section the seam will be located
within said turned wale.

"6. A section of a horse-collar made up from a one-piece or
integral blank which is folded so that the part which subsequent-
ly forms the fore-wale will be within the part which forms the

after-wale, a line of stitches which pass through the folded blank to connect the edges of the blank and form the wales, one of the wales being turned inside out prior to being filled."

This declaration was made between a patent granted to William O. Barnett, December 17, 1901, upon an application filed August 8, 1901, and the application filed May 14, 1902, by Andrew G. Couch for reissue of his patent No. 672,976, granted April 30, 1901, under application of June 2, 1900.

Couch alleged conception of the invention of the issue in June or July, 1898, with immediate reduction to practice. If these facts have been proved he is entitled to the award of priority over Barnett, whose preliminary statement alleged conception about June 15, 1899, with prompt reduction to practice thereafter, followed by manufacture and sale in large quantities.

It may be conceded that Barnett's evidence establishes his conception about the date alleged. Under the conditions of the testimony offered by Couch his right to priority depends upon its sufficiency to show both conception and reduction to practice in June or July, 1898. If what he then accomplished did not amount to a reduction to practice, he has lost his right because he was not exercising diligence at the time that Barnett entered the field.

The examiner of interferences decided in Couch's favor, but was reversed by the examiners-in-chief. They substantially admitted his conception in June or July, 1898, but deny either his reduction to practice or exercise of necessary diligence. The Commissioner, who affirmed their decision, does not deny the fact of Couch's conception. The ground of his decision is thus explained:

"Even if it is conceded that the evidence satisfactorily shows that Couch made a few collars embodying the invention in July, 1898, it must be held in the absence of any test of those collars, and in view of Couch's conduct in reference to them that they did not constitute a successful reduction to practice of this invention. They must be regarded as a mere abandoned experiment. Couch was clearly lacking in diligence after making

these collars until Barnett entered the field and employed an attorney to secure a patent for him."

Had the decisions been that Couch had no conception of the invention in July, 1898, and made no full-sized collar embodying it, we would hesitate to disturb them, because of uncertainty involved in his failure to preserve that first collar, his long delay in applying for a patent, and his failure, under the circumstances, to engage in their general manufacture for the trade.

His testimony of the early conception and embodiment of the invention is corroborated, however, by three intelligent and well-informed witnesses, two of whom have no apparent interest in the controversy, and none of whom was contradicted or impeached.

The sufficiency of this evidence, as we have seen, has not been denied by any one of the tribunals of the Patent Office, but has received the express approval of one, and the tacit approval, at least, of the others. We are not prepared, therefore, to deny its credibility and weight. Moreover, the conception of Barnett, which has been conceded, rests upon substantially the same weight of evidence, though not attended with such delay, and we find that like Couch he was unable to produce a collar of his early construction. The one which he made to illustrate his invention, he says, "lay around my shop for some time and was either destroyed or sold." Couch says that the first collar made by him in July, 1898, was, like others thereafter made, put in the general stock and sold therewith.

The question, therefore, upon which the award of priority must be be made to turn is this: Was the construction by Couch of a full-size horse-collar in July, 1898, a reduction to practice? In the light of decisions heretofore made we are compelled to answer that it was. *Loomis* v. *Hauser,* 19 App. D. C. 401, 404; *Mason* v. *Hepburn,* 13 App. D. C. 86, 89, and cases cited; *Lindemeyr* v. *Hoffman,* 18 App. D. C. 1, 5. The case first cited is substantially like the present. The invention was a paper ticket holder and consisted mainly of the manner in which the paper

was folded. A full-size illustrative model was held to be a reduction to practice. In *Mason* v. *Hepburn* it was said:

"Some devices are so simple and their purpose and efficacy so obvious that the complete construction of one of a size and form intended for and capable of practical use might well be regarded as a sufficient reduction to practice without actual use or test in an effort to demonstrate their complete success or probable commercial value."

Few articles, in our opinion, can be simpler than the common, cloth-cased horse-collar stuffed with cotton or other well-known filling. Such collars are sold each year in enormous numbers for general farm use in the State where both parties manufacture them, and in many other States. The particular advantage of the collar of the issue is that it conduces to cheapness of manufacture, though the doubling back of the casing in certain places may also increase its wearing value. At the same time it remains in appearance substantially the same as the familiar two-piece collar of like material and filling. It seems clear to us, as a matter of general knowledge, that it no more requires test upon the neck of a harnessed animal, to demonstrate its general purpose and utility as a collar, than would a glove or shoe, cut and stitched in some manner of patentable novelty, require to be worn in order to show its capacity as a covering for hand or foot. To be of satisfactory use, and in some instances to be used at all, each must be made reasonably to fit the particular hand, foot, or neck for which it may be wanted; but this same necessity has attended each one of these articles since its first introduction. The average user of horse-collars would hardly consider it necessary or important, after his first inspection, to make the satisfactory trial of the new collar a condition of its purchase. He would be amply able to judge of its utility, fitness and probable value from his examination of it in the place where exposed for sale.

Making a full-size collar therefore, exhibiting it to a number of persons, and putting it on sale, was the reduction to practice of the invention.

It follows that the decision must be reversed, and priority

awarded to the appellant Couch. It is so ordered, and that this decision and the proceedings herein be certified to the Commissioner of Patents as required by law.                    *Reversed.*