---

# ROLFE v. HOFFMAN.*

---

PATENTS; INTERFERENCE; ABANDONMENT OF INVENTION; REDUCTION TO PRACTICE.

1. An applicant in interference must prove priority beyond a reasonable doubt.

2. An inventor who has reduced his invention to practice is entitled to a period of two years in which to put the same in public use and on sale, without a forfeiture of his right to receive a patent, based upon an application filed by another before the statutory bar has arisen. Neither forfeiture nor abandonment within that period can be presumed, but must be proved. (Following *McBerty* v. *Cook*, 16 App. D. C. 133; distinguishing *Mason* v. *Hepburn*, 13 App. D. C. 86; *Warner* v. *Smith*, 13 App. D. C. 111.)

3. The diligence required of an inventor is diligence rather in the reduc-

---

*Invention—Abandonment.*—As to what constitutes an abandonment is discussed, and the authorities presented, in editorial notes to *Pennock* v. *Dialogue*, 7 L. ed. U. S. 327, and *Wollensak* v. *Sargent*, 38 L. ed. U. S. 133.

D. C.]                    Opinion of the Court.

tion of his invention to practice, than in application to the Patent Office, or in manufacturing his device for public use. (Following *Oliver* v. *Felbel*, 20 App. D. C. 255.)

4. In the case of simple devices, it is not essential that actual tests of the invention be made in order to constitute a reduction to practice.

5. A device for protecting low-tension circuits, such as telegraph, telephone, and fire-alarm, from injurious effects of unduly strong currents such as those carried by power and lighting circuits, belongs rather to the class of simple devices considered in *Mason* v. *Hepburn, supra,* and in *Roe* v. *Hanson,* 19 App. D. C. 559, than to the devices disclosed in *Macdonald* v. *Edison,* 21 App. D. C. 527.

6. The same act, or set of acts, may or may not constitute a reduction to practice, modified, as they may be, by the special circumstances of the particular case. (Following *Gallagher* v. *Hien,* 25 App. D. C. 77.)

7. In order to reduce to practice a device for protecting low-tension telephone circuits from the injurious effects of unduly strong currents, it is sufficient to operate the device with currents such as would prevail in telephone circuits if the latter became crossed with wires carrying more current than is safe; and it is not necessary actually to operate it in a telephone circuit.

No.  316.  Patent Appeals.  Submitted  November  21,  1905.  Decided December 5, 1905.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.              *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. A. Miller Belfield* and *Messrs. Bacon & Milans* for the appellant.

*Mr. Luther L. Miller* for the appellee.

Mr. Justice DUELL delivered the opinion of the Court:

This appeal is taken to review the decision of the Commissioner of Patents awarding priority of invention to Otto C. Hoffman of an invention in electric-circuit protectors. The various tribunals of the Patent Office have not been in accord. The

Commissioner and Examiner of Interferences agreed in rendering decisions in favor of Hoffman, while the Examiners-in-Chief found in favor of Charles A. Rolfe.

The invention in controversy is set forth in the following issues:

"1. In a thermal circuit protector, in combination, a fixed member; a spring, a spring finger fixed with relation to said fixed member and tending to lie in contact therewith, which finger is adapted to hold said spring flexed, said spring tending to separate the spring finger from said fixed member; and a solder connection between said fixed member and said spring finger.

"2. In a thermal circuit protector, in combination, a fixed member; a spring; a spring finger fixed with relation to said fixed member and tending to .lie in contact therewith, which finger is adapted to hold said spring flexed, said spring tending to separate the spring finger from said fixed member; a solder connection between said fixed member and said spring finger; and a substance offering comparatively ˉhigh resistance to the passage of an electric current, in proximity to said solder connection.

"3. In a thermal circuit protector, in combination, two ears; a spring finger adapted to lie in contact with each one of said ears; a spring adapted to be held flexed by said spring fingers and tending to separate said spring fingers from said ears; and a fusible solder connection between each one of said ears and its spring finger.

"4. In a thermal circuit protector, in combination, two ears; a spring; a spring finger adapted to lie in contact with each one cf said ears and to hold said spring flexed, said spring tending to separate the spring fingers from said ears; a fusible solder connection between each of said ears and its spring finger.

"5. In a thermal circuit protector, in combination, two ears; a spring; a spring finger adapted to lie in contact with each one of said ears and to hold said spring flexed, said spring tending to separate the spring fingers from said ears; a fusible solder connection between each of said ears and its spring finger; and

a substance offering comparatively high resistance to the passage of an electric current, in proximity to said solder connection.

"6. In a thermal circuit protector, in combination, a fixed member; a spring; a spring finger fixed with relation to said fixed member and tending to lie in contact therewith, which finger has a projection adapted to engage said spring to hold the latter flexed, said projection also causing said spring to tend to separate said spring finger from said fixed member; and a fusible solder connection between said fixed member and said spring finger.

"7. In a thermal circuit protector, in combination, a fixed member; a spring; a spring finger fixed with relation to said fixed member and tending to lie in contact therewith, which finger has a projection adapted to engage said spring to hold the latter flexed, said projection also causing said spring to tend to separate said spring finger from said flexed member; a fusible solder connection between said fixed member and said spring finger; and a substance offering comparatively high resistance to the passage of an electric current, in proximity to said solder connection.

"8. In a thermal circuit protector, in combination, two ears; a pair of spring fingers having inclined outer ends, said fingers adapted to lie between said ears, each of said fingers contacting one of the ears; a fusible solder connection between each one of said ears and its spring finger; and a spring having an opening adapted to receive the outer ends of said spring fingers, said spring being held flexed by said fingers when the fingers are held by said solder connection, but tending to separate said fingers from said ears."

Hoffman is the senior party, and relies upon the record date of his application for patent, which was filed January 19, 1903, and matured into a patent dated November 17, 1903. Rolfe is an applicant. His application was not filed until December 29, 1903, forty-two days after the issue of Hoffman's patent. To prevail, Rolfe must prove priority beyond a reasonable doubt. He must overcome Hoffman's conception and disclosure predi-

cated upon the filing of Hoffman's application, and the constructive reduction to practice by Hoffman, based on the same act. The date to be overcome, it will be remembered, is January 19, 1903.

That Rolfe was the first to conceive and disclose the invention to others is established beyond a doubt. His case really turns upon the weight that is to be given to his three exhibits Nos. 1, 2, and 3. These exhibits, one and all, contain the elements of each count of the issue excepting the spring or springs which support the heat-cartridge. That these exhibits were made by Rolfe in December, 1901, and by him shown to Wiesinger and Schwarze about that time, is sufficiently proved, and is not successfully questioned. If they constituted a reduction to practice, then Rolfe is entitled to an award of priority, for he will then have proved priority of conception, disclosure, and reduction to practice, and, in the absence of any clearly proved abandonment, his right to a patent has not become forfeited either to the public or to his rival. It is true that two years elapsed between his alleged reduction to practice and the filing of his application for patent, during which interval his rival entered the field and secured a patent. Such a period of delay, standing by itself, does not constitute an abandonment of his right to a patent based on priority of invention. An inventor, having reduced his invention to practice, is entitled to a period of two years in which to put the same in public use and on sale without a forfeiture of his right to receive a patent based upon an application filed before the statutory bar has arisen. Neither abandonment nor forfeiture within that period can be presumed, but must be proved. True, the acts of an inventor may be such as to amount to an abandonment or forfeiture within that period, but such acts must be proved. Moreover, his proved acts may be such as to require a finding that what he did was not a reduction to practice but must be rated as an abandoned experiment. The doctrine enunciated by this court in *Mason* v. *Hepburn,* 13 App. D. C. 86, and *Warner* v. *Smith,* 13 App. D. C. 111, was based upon the facts disclosed by the records in those cases, and the rule there laid down will not be extended to any case not com-

ing clearly within it, as we said in *McBerty* v. *Cook,* 16 App.
D. C. 133. There is absolutely nothing in the record in this
case to warrant a finding of abandonment by Rolfe. It appears
that Rolfe, after making these exhibits, submitted them to his
patent attorney, with whom they were left to be patented in their
turn;.that the American Electric Fuse Company had the right
to obtain patents for Rolfe's inventions in the art to which the
device in controversy relates, and exercised that right subsequent
to December 1, 1901, to the extent of filing about twenty appli-
cations; that Rolfe talked more or less about this invention with
others, and that he preserved the exhibits. These facts negative
any idea of abandonment of the invention. It is not necessary to
determine whether or not the facts disclosed are sufficient to
prove that Rolfe was as diligent as he should have been had he
only been the first to conceive and disclose, and not the first to
reduce to practice. As we said in *Oliver* v. *Felbel,* 20 App. D.
C. 255: "The diligence required of an inventor is diligence
rather in the reduction of his invention to practice than in ap-
plication to the Patent Office, or in manufacturing his device for
public use." Furthermore, conceding that Rolfe was the first
to reduce to practice, he did not unreasonably delay the filing
of an application for patent, and has sufficiently shown the rea-
son for such delay as there was.

Was the construction of exhibits Nos. 1, 2, and 3 by Rolfe an.
act sufficient to base a finding of reduction to practice, or was.
such construction, plus such test of them as was made, suffi-
cient? An affirmative answer to either branch of the question.
must result in an award of priority to Rolfe.

Rolfe made these exhibits in December, 1901, and showed
them to Wiesinger and Schwarze, both of whom were familiar
with inventions and devices relating to the electric art. He
operated them in the presence of the former, but not before.
Schwarze, who says, however, that when Rolfe showed them to
him he examined and understood them, and told Rolfe that it.
was not necessary to operate them, as he knew they would work..
He testified that he had been in the electrical business for thirty
years, and had had experience with a variety of electric appli-

ances, including telephones and telephone appliances. The invention relates to devices for protecting low-tension circuits, such as telegraph, telephone, and fire-alarm, from injurious effects of unduly strong currents, such as those carried by power and lighting circuits. The art is a well-developed one, and most of the devices used for the purpose are simple and their working well understood, not only by electricians, but by those who work in that line, yet lay no claim to be ranked as experts. A man of ordinary skill and experience in the art would, in our opinion, understand the device in controversy, and would come to the conclusion that it would work. The Patent Office raises no question that Rolfe has fully described an operative device, and when that device shown and described in the application for the patent is substantially the same as the device made in December, 1901, that fact, at least in the present case, is persuasive that the device belongs to that class of simple devices where it is not essential that actual tests of the invention be made in order to complete the inventive act. The device in controversy belongs to the type of simple devices disclosed and referred to in *Mason* v. *Hepburn, supra; Roe* v. *Hanson,* 19 App. D. C. 559, and analogous cases, rather than to the devices disclosed in *MacDonald* v. *Edison,* 21 App. D. C. 527, and analogous cases.

We agree with the following statement of the Examiners-in-Chief referring to these exhibits, adding that, in our opinion, the expert in the art would not be required to rank very high among experts to come to the conclusion that the device would operate. They said: "Exhibits 2 and 3 are of the type of the preferred form of Rolfe's application and Exhibit 1 is that of the other form of his application. Each exhibit contains the elements of each count of the issue excepting the spring or springs which support the heat-cartridge. Those springs, having forked upper ends to receive and removably support the heat-cartridge and acting to separate its parts when the solder uniting them is melted, were then old in the art. But in that prior art the parts, after separation to break the circuit, did not resume their original closed-together relation to restore the circuit, nor did they become resoldered ready for another like operation by another abnormal

current. From these facts it is evident that to any expert in the art each of these exhibits of heat-cartridges indicates at sight that they are constructed to be inserted into the old forks of the old springs, and that by those old springs the part of the heat-cartridge of each exhibit will be separated on the melting of the solder uniting them, to break the circuit, and that, then, the spring fingers being released from one of the springs will resume the closed-together position and be resoldered by the setting of the solder just melted by the heat of the abnormal current. In short an expert in the art at sight of either exhibit would understand its construction and operation and would know whether or not it would successfully operate for its purpose."

But if the device in controversy belongs to the more numerous class of inventions which require test and workings to prove that they are operative and have been clearly reduced to practice we believe that the test made by Rolfe, and witnessed by Wiesinger, of this simple device in this well-developed art, was sufficient to prove that it would operate under all usual conditions and that it was not necessary to operate it in a telephone circuit in order to claim a reduction to practice. As said in *Gallagher* v. *Hien,* 25 App. D. C. 77: "In considering this question [tests constituting a reduction to practice] we apprehend that the same act or set of acts may or may not constitute a reduction to practice, modified, as they may be, by the special circumstances of the particular case."

Rolfe says that when the devices were tested "they were placed between two springs and connected with the circuit with wires and the current heated up the solder. As soon as the solder became heated to 160°, it allowed the spring-points to go together and release the circuit-spring and open the circuit. The springs went back to their original position before the solder cooled and resoldered."

He further says that he operated the devices with currents such as would prevail in telephone circuits if the telephone circuits became crossed with wires, carrying more current than was safe. This was a fair test, for the devices would not be called into play when placed in a telephone circuit until something more than

the ordinary current flowing through the circuit was present. It needed an unduly strong current to call the devices into operation. Such a current was used.

When the exhibits were made and tested, we consider that "the work of the inventor was finished, physically as well as mentally," and that there was a complete reduction to practice.

Rolfe, being the first to conceive, the first to disclose the invention in controversy to others, who thoroughly understood it, and its working, and the first to reduce it to practice, is the first inventor, and, being such, is entitled to an award of priority, for he never abandoned his invention or concealed it from the public.

It follows that the decision of the Commissioner must be reversed and priority of invention awarded to Rolfe; and it is accordingly so ordered. The clerk of this court will certify this opinion and the proceedings of this court in the cause to the Commissioner of Patents, according to law.					*Reversed.*