# SYDEMAN *v.* THOMA.

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; DILIGENCE

1. Whether certain acts done show reduction to practice depends upon special facts and circumstances of the particular case.

2. It is essential that a device, to constitute reduction to practice, must show that the work of the inventor is finished, physically as well as mentally. Nothing must be left to the inventive genius of the public. (Following *Gallagher* v. *Hien,* 25 App. D. C. 77.)

3. The decisions involving the question of reduction to practice may be divided into three general classes, namely: (1) those including devices so simple and of such obvious efficacy that a complete construction of one of a size and form intended for and capable of practical use is held sufficient without test in actual use (citing *Mason* v. *Hepburn,* 13 App. D. C. 86; *Lindemeyr* v. *Hoffman,* 18 App. D. C. 1; *Loomis* v. *Hauser,* 19 App. D. C. 401; *Couch* v. *Barnett,* 23 App. D.

C. 446; *Rolfe* v. *Hoffman,* 26 App. D. C. 336); (2) those where a machine embodying every essential element of the invention, having been tested and its practical utility for the intended purpose demonstrated to reasonable satisfaction, has been held to have been reduced to practice notwithstanding it may not be a mechanically perfect machine (citing *Coffee* v. *Guerrant,* 3 App. D. C. 497; *Norden* v. *Spaulding,* 24 App. D. C. 286; *Smith* v. *Brooks,* 24 App. D. C. 75; *Andrews* v. *Nilson,* 27 App. D. C. 451; *Lowrie* v. *Taylor,* 27 App. D. C. 522; *Burson* v. *Vogel,* 29 App. D. C. 388 and *Howard* v. *Bowes,* 31 App. D. C. 619); and (3) those where the machine is of such a character that the particular use for which it is intended must be given special consideration and requires satisfactory operation in the actual execution of the object (citing *Macdonald* v. *Edison,* 21 App. D. C. 527; *Paul* v. *Hess,* 24 App. D. C. 462; *Gallagher* v. *Hien,* supra; *Ocumpaugh* v. *Norton,* 25 App. D. C. 90; *Sherwood* v. *Drewson,* 29 App. D. C. 161). In cases within the second and third classes, long delay in putting the machine in actual use for the intended purpose is a potent circumstance in determining whether the test was successful, or only an abandoned experiment.

4. In an interference case involving the invention of a machine for rapidly and efficiently treating duck with an adhesive material so as to render the coating tacky or sticky, in order that the fabric may be readily applied to other objects, such as insoles for boots and shoes, where it appeared that the junior parties constructed a machine, but laid it aside because it worked too slowly,—that is, would not well and quickly dry and heat the wet fabric,—and did not go actively to work to improve it until they had heard of the apparent success of the senior party's machine, it was *held* that the junior parties did not reduce to practice, and also that they were lacking in diligence.

No. 529. Patent Appeals. Submitted November 20, 1908. Decided January 5, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.                    *Affirmed.*

The facts are stated in the opinion.

*Mr. Charles H. Duell, Mr. Nathan Heard, Messrs. Crosby & Gregory* for the appellants.

*Mr. Horace Van Everen* and *Mr. Francis J. V. Dakin* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority of invention of a machine for treating duck, having a heating of adhesive material, so as to render the coating "tacky," or sticky. The issue is in the three following counts:

"1. In apparatus of the class described, means to support the coated fabric and cause it to travel longitudinally, means to apply moisture to said fabric, and means to subject simultaneously corresponding portions of the fabric to dry-heat, to soften and render tacky the coating thereof.

"2. A machine for applying innersole reinforcing fabric, comprising means for delivering a continuous web of fabric previously coated with cement on one side only, moisture-applying means containing water or steam for application to said previously cemented web, feed pipes for supplying said water or steam, means for applying heat to said web for rendering the coated side thereof tacky in its progress through the machine, and co-operating means combined with the aforesaid mechanism to maintain said coated side undisturbed and deliver the same to be cut in a moist and tacky condition.

"3. A machine for applying innersole reinforcing fabric, comprising means for delivering a continuous web of fabric previously coated with cement on one side only, moisture-applying means containing water or steam, a feed drum, and means co-operating therewith for rendering the coated side of said fabric tacky while being fed through the machine."

The proceedings in the Patent Office may be briefly stated as follows: On March 13, 1905, Andrew Thoma made application for a patent for the method of making adhesive duck, as practised on his machine. The machine was described, but not claimed therein. Process patent issued February 13, 1906. May 15, 1905, he filed the application of this interference for a patent on the machine or apparatus.

June 9, 1905, Abraham Sydeman, James Meade, and one Gallagher filed a joint application for a machine to accomplish the

same object. Interference was declared between these two applications. Preliminary statements were filed, but the juniors took no evidence, and abandoned their application. April 13, 1906, Sydeman and Meade, omitting Gallagher, filed a new application, identical in description with the abandoned one, and interference with Thoma was declared thereon. A volume of testimony was taken relating to conception and reduction to practice, by the respective parties. The Examiner of Interferences found that Sydeman and Meade conceived the invention in January, 1903; that Thoma conceived it in January, 1905, and obtained constructive reduction to practice on March 13, 1905, by filing his method application on that date. He found that Sydeman and Meade's evidence relating to reduction to practice, in May, 1904, failed to establish the same, and that they were not exercising diligence when Thoma entered the field. He consequently awarded priority to Thoma. This decision was affirmed on successive appeals to the Examiners-in-Chief and the Commissioner, and further appeal has been prosecuted to this court by Sydeman and Meade.

In the consideration of the foregoing questions it is immaterial whether Thoma be accorded the date of his method application, or of this one as constructive reduction to practice; and there seems to be no question but that he conceived the invention early in January, 1905. Before proceeding to the consideration of the question of reduction to practice by Sydeman and Meade in 1904, it is deemed advisable to give a brief history of the state of the conditions at the time, and the purposes of the invention, as an aid to the elucidation of the questions to be determined. Cloths of various kinds had long been coated with combinations of gutta-percha and other things for rendering them waterproof, and many persons were engaged in the manufacture; among them the Plymouth Company, owners of the Sydeman and Meade application, and the Clifton Company, owner of Thoma's. Some of this material, consisting of thin domestics and drills, and called "plumping cloth," had been used for lining the "uppers" of shoes, among other uses. As the price of leather increased, canvas began to be substituted there-

for in making inner soles of cheap shoes. The "sleeper" inner sole was first invented. In this the inner sole was made up of a lower layer of canvas, having a rib molder thereon, a center layer, and an upper layer all cemented together and trimmed. This was followed by the invention of the "Gem" inner sole. In this a low-grade light leather was used and a rib formed on it, which was reinforced with canvas or duck cemented so as to adhere thereto. The method first used was substantially this: The leather inner sole was cut in the desired form, a rib formed on it, and then covered on the rib side with rubber cement. The reinforcing canvas, cut in strips of requisite width, was coated with rubber cement. Both these and the leather inner soles were allowed to dry sufficiently to become "tacky." The canvas was then pressed on the inner sole aforesaid, their cemented sides in contact, and formed in and around the rib thereof. The inner sole thus made was then passed through a machine known as the "Gem," which pressed the canvas firmly to the leather, and formed or tacked it around the rib, and at the same time trimmed the edge of the canvas even with the edge of the leather. This process was a slow one, as the cement had to dry for a time before the canvas was applied to the leather, and was expensive. The object of the new invention is to overcome these defects by using duck coated with a suitable preparation, passing the same, when cut in suitable strips, through water or steam, in order to make it pliable and easily fitted to the leather inner sole, and then heating it, drying out some of the water, and rendering it "tacky," so that it can be pressed into firm adhesion with the leather. It was readily ascertainable that this could be effected in a satisfactory manner, by simply taking a piece of the material in the hand, wetting it and then heating it upon anything hot enough, applying it to the leather inner sole, and pressing into adhesion. This process would necessarily be slow and expensive. The desirable object was to make a machine, by passing through which both the moistening and heating would be accomplished, and the material delivered to the operator for cutting the required length and placing on the inner sole, to be pressed by the "Gem" machine.

The parties to this interference were not manufacturing either machinery or shoes, and apparently had no idea of becoming engaged therein. They had like interests and were actuated by the same motive. Being manufacturers of coated duck, they reasonably expected to greatly increase their sales by discovering a machine that would simultaneously and effectually moisten and heat the passing material, with requisite speed, so that it could be continuously used by the operator, who pulled it upon the table, cut it in proper lengths, and applied it to the inner sole for pressure and trimming by the "Gem" machine. Both parties have since been furnishing their completed machines to shoe manufacturers, free of charge, for the purpose of making a market for their coated duck goods. No part of the invention is in the discovery that the coated duck, when moistened and heated, is capable of use as a cheap and suitable reinforcement for a leather sole. It consists in a machine that will moisten and heat the material in such a manner as to meet the necessary requirements of shoe manufacturers. Failing this, the machine would be of no practical value to them, and would not be adopted by them; and without their adoption it would be of no value to the inventor.

Assuming, for the present, the general truthfulness of the testimony relating to the alleged reduction to practice by Sydeman and Meade in 1904, and the accuracy of the dates assigned thereto, we will now consider the legal effect of that testimony. Sydeman and Meade tried pieces of the material by first cutting it and then heating it on the cylinder of their factory engine. When heated enough to become "tacky," they applied it to leather inner soles, by hand, and found it would adhere tightly to the leather. Appreciating the importance of a machine that would operate as before described, they conceived the idea of the one now claimed, and, after some other experiments, set about its construction in April, 1904. As first constructed, it consisted of a drum of galvanized iron about 21 inches in diameter, over which the strips of material were to be passed for heating, with the uncovered side next to the drum surface. To provide the heat, a flat coil of pipes was inserted in the drum, through

which steam was passed from the boiler of the factory engine.
The machine was set up for operation in the engine room. A
small tank of hot water was set at the bottom, with a roller in
or next it, under which the strips passed for melting, and then
up and over the drum for heating, before being ready for deliv-
ery to the shoe operator. The drum was made to revolve by pull-
ing the strips on to the cutting table. This was operated several
hours, but would not give heat enough. As the constructor said:
"It worked very slow; too slow to be a success." It was due
to "not enough heat in the drum." To obviate this trouble, a
round coil of pipe was substituted for the flat one, and supplied
more heat to the drum surface. Of this the constructor said that
it "worked very satisfactorily. Mr. Meade was well pleased
with the way the machine worked." But he said there was an
objection: "The machine worked too slow to put into a shoe
shop." When asked what was done to secure more speed, he
said that he started on a new machine. The new machine was
to be like the old one, save that an outside, stationary drum was
to be put over the revolving one. The idea of this was to retain
the heat and increase its effect on the material passing over the
inner drums. This new machine was not finished until in May,
1905. In direct examination the witness said: "It stuck the duck
on the leather fine, and Mr. Meade and Mr. Sydeman were high-
ly pleased with it." It proved more speedy than the first ma-
chine. This constructor left the employ of the Plymouth
Company May 13, 1905, and returnéd later in the year. Meade
said the machine worked satisfactorily, but was a little too
clumsy to present to the shoe manufacturing trade. "We decid-
ed we would have to make it a little more compact." This ma-
chine and the first one were placed in the storehouse, and was
destroyed by fire. The first was thought to have been destroyed
by the same fire, but during the taking of the testimony it was
found and produced. The constructor of these machines, Lane,
was the engineer in charge of the factory engine. He left May
13, 1905, but returned a considerable time thereafter. In the
meantime his place was first taken by one Gallagher. During
April, 1905, Sydeman and Meade knew that the Clifton Com-
pany had put out the Thoma machine, and intended to apply

c

for a patent on it. Gallagher was directed to make a new machine, which he did. He did away with the water tank, and supplied moisture within the outer casing by means of a steam spray. It was on a machine of this construction that the joint application (June 9, 1905) of Sydeman, Meade, and Gallagher was based. It would seem that the passage of the material through the hot-water tank was then regarded as preventing the rapid heating and drying. In the specification of the application in interference, which is identical with the earlier one of Sydeman, Meade, and Gallagher, it is said: "As will appear hereafter, the apparatus is so constructed and arranged that the textile fabric is not dampened or wetted, so that when the treated fabric is applied to some other object, as an insole, the latter is ready for further operations connected with the manufacture of the boot or shoe without requiring any drying operation." Later they say they have "found that the treating the fabric to soften the coating thereof may be hastened, and with some kinds of coating material improved, by subjecting the exposed or coated face of the fabric to the action of moist heat while the opposite or textile face is subjected to dry heat." This is provided for by introducing steam into the space between the casing and the drum. They also say that "instead of introducing steam into the casing, moisture-laden air may be employed in lieu thereof."

The object of the invention is thus stated: "This invention has for its object the production of apparatus for rapidly and efficiently treating textile fabric coated with a rubber or guttapercha compound or composition, to the end that the coating may be temporarily softened or rendered 'tacky' in order that the fabric may be readily applied to other objects, such as insoles for boots and shoes, etc.  *  *  *  By means of our present invention the coated fabric is rapidly and efficiently treated, so that as the fabric emerges its coated surface is in the desired tacky condition for application to another object." In answer to a question by his own counsel, Meade said:

"From 1903 until 1905 Mr. Sydeman and I had no intention of attempting to get a patent on the process for covering Gem innersoles, until in the month of May I was informed by my

brother Matt. that there was a machine similar to the one I had talked to him about, running in the shoe factory in Brockton, and he understood that they had applied for a patent. I took the matter up with Mr. Sydeman, then with our attorney, who advised us to take out a patent to protect our rights."

That Meade, who was an employee of the Plymouth Company, regarded the first experiments as failures, for the purpose sought to be accomplished, is also borne out by the fact that on April 12, 1905, he entered into a written agreement with the Brockton Rubber Works Company for hire to it for two years from May 1, 1905. This agreement was not carried out by him, for reasons that do not appear very satisfactory from his statement of them. Stowe, the president of that company, testified that when Meade came to him seeking employment, he asked Meade if he knew of a good compound for use in this work. Meade said he did. He then asked Meade if he knew of a machine for running this duck through to stick it in the condition required in shoe factories, and he said he did not. Witness said that he then drew a diagram of a machine he had seen in the Snow Company factory, and explained it to him, telling him the machine was now in use, and patent pending for the same. Further told him that he (witness) had dropped the matter, owing to the question of a patent, but that he thought it possible a machine could be constructed that would not be an infringement of the patent that he supposed then belonged to the Clifton Company; that he thought a machine could be made whereby steam was used, instead of hot water. Meade positively denied this statement. The circumstances favor the credibility of Stowe, who was a disinterested witness engaged in the rubber-coating business, and, moreover, thought that Meade was to enter his employment as superintendent of his factory on the first of the ensuing month.

We think it clear from the evidence that Sydeman and Meade regarded their experiment in 1904 as a failure, and practically abandond the same until after they had been informed of the instalment and operation of the Thoma machine in one or more shoe factories. We are unable to reconcile their statement that

the machines worked satisfactorily, with the admission that they worked too slow, as well as with their subsequent conduct. They well knew that the fabric, when sufficiently moistened and heated, could be successfully applied in the reinforcing of the Gem leather insoles. This had been demonstrated by the hand experimental operations. But the hand operation was too slow for the shoe manufacturers, and therefore useless. The thing to be attained was the construction of a machine, after passing through which the material would emerge in a pliable and "tacky" condition, and sufficiently dry so that it could be rapidly cut and applied and passed to the pressing machine. This alone would meet the demand of the shoe manufacturers. "Working too slow" could not mean anything else than that the heat applied in passing the material through the machine was not sufficient to enable it to be applied as desired, for it could pass the fabric as rapidly as any of the later improved machines. None of them are automatic, and the fabric is pulled through and out by the operator who is to cut and apply it. If the fabric were pulled more rapidly, the heating period would be less; if less rapidly, more water would be absorbed in passing through the tank, and more heat and drying time would be required. The chief feature of the subsequent conduct, referred to, is the long delay in making the new machine of the last construction, completed in May, 1905. The machine was a simple one that could have been made by an ordinary tinner or sheet-iron worker in a very short time, a few days at the most. The inventors had abundant means to employ such persons, who were near at hand. Instead, they left it to the engineer, Lane, who was not an expert in that line, to be constructed during the time he could save from his regular duties. His work occupied nearly a year. The entries in his diary, which, he said, referred to work on this new machine, show the following: Week ending May 28, 1904, 15 hours making coil and 4 hours fixing pipe; week ending June 25, 10 hours putting pipe in tank; week ending Oct. 15, making coil of pipe; week ending January 7, 1905, 20 hours making drum; week ending April 1, 20 hours working around new machine; week ending April 8, 5 hours same thing; week

ending May 6, 50 hours same thing; week ending May 13, 18 hours making new coil of pipe for new machine. He left the employment that day. There is no reasonable excuse for this long delay, if they had been satisfied with the test of the earlier machine. Moreover, when the new machine was remodeled by Gallagher, who omitted the water tank, and substituted a steam spray for softening the fabric and aiding in heating it, they, apparently for the first time, regarded the invention as satisfactorily completed, and included him in their first application as a *joint* inventor with themselves.

All of the tribunals of the Patent Office concurred in holding that upon this state of facts there was no reduction to practice in May, 1904, and that there was no diligence being exercised by the inventors in the matter of reduction to practice when Thoma entered the field. Whether certain acts done show reduction to practice depends upon the special facts and circumstances of each particular case. As was said in a former case: "In considering this question we apprehend that the same act or set of acts may or may not constitute a reduction to practice, modified, as they may be, by the special circumstances of the particular case. We do not think that the size of a device is necessarily controlling in determining the question of a reduction to practice. In *The Corn-planter Patent,* 23 Wall. 181, 23 L. ed. 161, a half-sized device was held to be the equivalent of a reduction to practice, but that device was actually used in planting corn, and completely demonstrated the utility and practicability of the device. Nor do we think that mechanical perfection, or that, as has been well stated, there are 'possibilities of greater excellence in shape, location, arrangement, material, or adjustment,' essential for a reduction to practice. Tested by any such requirements, nearly every pioneer invention, as put upon the market, would have failed to support the patent granted for it. Nevertheless, it is essential that a device, to constitute a reduction to practice, must show that 'the work of the inventor must be finished, physically as well as mentally. Nothing must be left for the inventive genius of the public.' " *Gallagher* v. *Hien,* 25 App. D. C. 77, 81, 82.

The device in that case was a frictional spring for use in railway couplings. Gallagher was the first to conceive the invention, and relied upon a test as actual reduction to practice. He made a spring, the exterior rings of which were something over 3 inches in diameter, and about an inch wide. It was first tested by pressure in a vise. It was then taken to the shops and the springs tempered; after which it was put in a vise on the anvil of a very powerful steam hammer. It made a good showing of its action, but finally broke under a very hard blow. This was held not to constitute reduction to practice, and priority was awarded to Hien, who conceived the invention later, but made a satisfactory reduction to practice. As appears from the opinion quoted above, the difficulty does not lie in the fact that the spring was small. The invention was declared a simple one, but it was said that it "undoubtedly belongs to that class which requires either actual use or thorough tests to demonstrate its practicability and therefore there can be no actual reduction to practice until one or the other thing takes place and is proven."

Decisions involving this often-litigated question of actual reduction to practice may be divided into three general classes. The first class includes devices so simple and of such obvious efficacy that the complete construction of one of a size and form intended for and capable of practical use is held sufficient without test in actual use. *Mason* v. *Hepburn,* 13 App. D. C. 86, 89; *Lindemeyr* v. *Hoffman,* 18 App. D. C. 1, 5; *Loomis* v. *Hauser,* 19 App. D. C. 401, 404; *Couch* v. *Barnett,* 23 App. D. C. 446, 449; *Rolfe* v. *Hoffman,* 26 App. D. C. 336, 342. The second class consists of those where a machine embodying every essential element of the invention, having been tested and its practical utility for the intended purpose demonstrated to reasonable satisfaction, has been held to have been reduced to practice notwithstanding it may not be a mechanically perfect machine. In other words, it is sufficient reduction to practice, although a more desirable commercial result may be obtained by some simple and obvious mechanical improvement, or by substituting another well-known material for the one used in the original construction, as, for example, metal for wood, cast metal

for sheet metal, and the like.   *Coffee* v. *Guerrant,* 3 App. D. C.
497, 499 ; *Norden* v. *Spaulding,* 24 App. D. C. 286, 290 ; *Smith*
v. *Brooks,* 24 App. D. C. 75, 80 ; *Andrews* v. *Nilson,* 27 App.
D. C. 451, 457 ; *Lowrie* v. *Taylor,* 27 App. D. C. 522, 526 ;
*Burson* v. *Vogel,* 29 App. D. C. 388, 394 ; *Howard* v. *Bowes,*
31 App. D. C. 619, 622.   The third class includes those where
the machine is of such a character that the particular use for
which it is intended must be given special consideration, and
requires satisfactory operation in the actual execution of the
object.   *Macdonald* v. *Edison,* 21 App. D. C. 527, 529 ; *Paul* v.
*Hess,* 24 App. D. C. 462, 467 ; *Gallagher* v. *Hien,* 25 App. D.
C. 77, 82 ; *Ocumpaugh* v. *Norton,* 25 App. D. C. 90, 93, 94 ;
*Sherwood* v. *Drewson,* 29 App. D. C. 161, 173.

In cases falling within the second and third classes described,
long delay in putting the machine in actual use for the intended
purpose has always been regarded as a potent circumstance in
determining whether the test was successful, or only an aban-
doned experiment.

Notwithstanding the failure of Sydeman and Meade to at-
tempt to introduce the machine of 1904 into commercial use,
when it was of such great importance to do so, and their negli-
gence in constructing the new and improved machine of 1905,
which they regarded as showing such patentable novelty as to
entitle the improver, Gallagher, to claim a part of the invention,
it is earnestly contended that the evidence in regard to the con-
struction and test of the 1904 machine brings it within the prin-
ciple of the second class of cases above mentioned.   We cannot
concur in this view.   As before said, it was known that the coat-
ed duck could be moistened and heated so that it would adhere
effectually to the leather insole of the shoe.   The purpose in view
was to construct a machine that would operate so as to perform
this moistening and heating in a practically useful manner com-
mercially.   The purpose of the parties was to produce a machine
for "rapidly and efficiently" treating the coated fabric so that it
would become sufficiently soft and tacky, as it emerged continu-
ously from the machine, to be effectually applied to the leather
inner soles.   Without this capacity the machine was of no prac-

tical utility, and valueless to the manufacturer of shoes on the one hand, and the manufacturers of the fabric on the other. Becoming satised that the machine was too slow,—that is to say, in our opinion, that it would not efficiently as well as rapidly dry and heat the wet fabric,—the parties laid it aside, and did not go actively to work to improve upon it until they had heard of the apparent success of Thoma's machine and process. We are constrained to hold that there was not a reduction to practice, as claimed, in 1904. To hold otherwise would establish a dangerous precedent.

It is evident, from what has been said regarding the delay of the parties between May, 1904, and May 19, 1905, that they were not exercising the requisite diligence when Thoma entered the field.

These conclusions render it unnecessary to consider the question raised as to the credibility of the evidence relating to the alleged reduction to practice in 1904.

The decision in favor of Thoma will be affirmed. It is so ordered, and that the clerk certify this decision to the Commissioner of Patents.                    *Affirmed.*

A motion for a rehearing was overruled February 2, 1909.