**GOULD INC.**

v.

**The UNITED STATES.**

No. 429–74.

United States Court of Claims.

May 17, 1978.

As Amended on Denial of Rehearing
June 27, 1978.

William E. Schuyler, Jr., Washington, D. C., attorney of record, for plaintiff. George P. Edgell, Washington, D. C., Eber J. Hyde, Cleveland, Ohio and Schuyler, Birch, Swindler, McKie & Beckett, Washington, D. C., of counsel.

Claud A. Daigle, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Vito J. DiPietro, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KASHIWA, Judges.

OPINION

PER CURIAM:

This case comes before the court on exceptions by the parties to the recommended decision of Trial Judge Joseph V. Colaianni, filed July 29, 1977, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, with a minor deletion by the court, it hereby affirms and adopts * the decision, as modified, as the basis for its judgment in this case.**

█ In adopting the trial judge's opinion, the majority of the court emphasizes that (a) as the trial judge points out, the alleged

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed July 29, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

** The dissenting opinion of Judge Nichols follows the opinion of the trial judge which has been adopted by the court.

"experimental" work (on which plaintiff relies) did not involve details which are specifically recited or necessary in the elements of claims 1, 2, 3, or 5—the only claims now in suit—but other aspects of the "barrel engine" not involved in the inventions described in those claims; (b) as pointed out in *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 274–275, 282 *ff.* (5th Cir.), cert. *denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974), there are differing uses of "reduction to practice" and the only form of "reduction to practice" which allows a longer-than-a-year period of "experimental use" under 35 U.S.C. § 102(b) is that which occurs prior to testing for utility or to perfect or complete the invention itself; and (c) the record in this case shows that the inventions in claims 1, 2, 3, and 5 had already been "reduced to practice" in the other sense in that these inventions had already been determined by the patent-holder to be useful and complete in themselves, and that the so-called "experimentation" involved here was directed toward new and other inventions (for which the Government would be licensed under its contracts).

■ It is therefore concluded that claims 1, 2, 3, and 5 of the Hamlin patent are invalid and that plaintiff is not entitled to recover. The petition is dismissed.

### OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge.

In this patent suit brought pursuant to 28 U.S.C. § 1498, plaintiff, Gould Inc. (hereinafter referred to as "Gould"), seeks "reasonable and entire compensation" for the alleged unauthorized use by the Government of plaintiff's patented invention. The parties have agreed that the issues of infringement and validity of the patent would be determined first. Further, the parties have agreed that the amount of plaintiff's recovery, if any, would be deferred until after a final ruling by the court on the questions of infringement and validity.

The patent in suit, United States Patent No. 3,151,527 (hereinafter referred to as the "Hamlin" patent), was filed as application Serial No. 60,746 on October 5, 1960, and issued on October 6, 1964, to Halley H. Hamlin for an invention entitled "Barrel Engine." Plaintiff Gould by mesne assignments is the successor in interest to the original assignee, Clevite Corporation (hereinafter referred to as "Clevite"), and presently is the owner of all right, title and interest in the patent.

Only claims 1, 2, 3 and 5 are before the court. The remaining claims either are not alleged to be infringed or are conceded to have been reduced to practice under Government contracts which require a license to the Government on all inventions reduced to practice under such contracts. For reasons explained below, it is concluded that claims 1, 2, 3 and 5 are invalid because embodiments of these claims were on sale, within the meaning of 35 U.S.C. § 102(b), more than 1 year before the filing of the patent application.

### Background Facts

Around 1953, Clevite, a corporation with a substantial background in torpedo propulsion systems, recognized that the electric propulsion systems then being used in torpedoes had reached a state of development where the amount of power they produced could only be increased through significant increases in the weight and space required for such systems. Therefore, they concluded that nonelectric propulsion systems would need to be developed to achieve the higher speeds being demanded of future generations of torpedoes.

In the period 1953 to 1955, Clevite spent about $30,000 to investigate the feasibility of a gas-driven counterrotating engine being used as an alternate propulsion system. By late 1955, Clevite was ready to demonstrate to the Navy the feasibility of using gas-driven engines as the propulsion system for torpedoes.

This early engine, which developed less than 12 hp., was arranged in a torpedo afterbody with a propeller attached to each of the two counterrotatable output shafts. The afterbody was then mounted within a

tank of water. At a November 4, 1955, demonstration, in the presence of naval and Clevite personnel, compressed nitrogen was fed into the engine causing the propellers to rotate in opposite directions and the water in the tank to be forced rearward of the torpedo afterbody.

The Navy was apparently sufficiently impressed with the demonstration to award Clevite contract NOrd 16753 on January 17, 1956, to develop the engine into a solid monopropellant-fueled engine capable of delivering about 30 hp. A second contract, NOrd 17826, to enlarge the engine to about 75 hp., was awarded on May 28, 1957, by the Navy to Clevite. On September 15, 1958, Aerojet-General Corporation (hereinafter referred to as "Aerojet"), working under Navy Contract NOrd 18326 to develop the high performance Mk 46 Mod 0 torpedo, awarded Clevite a subcontract to again increase (scale-up) the output horsepower of the engine. During the performance of the Aerojet contract, Clevite delivered at least 8 barrel engines to Aerojet and, in addition, quoted prices on even larger quantities. Finally, on October 5, 1960, Clevite filed an application on the inventions embodied in the engine. The claims varied in scope and included coverage of the embodiment developed by Clevite before the first contract with the Government, as well as embodiments and improvements developed under the Government contracts.

Plaintiff has sued only on claims 1, 2, 3 and 5 which are the claims that it contends were reduced to practice before the first Government contract.[1] Among other defenses, defendant alleges that the invention covered by the claims in suit was not re-

duced to practice until after the first Government contract. Therefore, since defendant is entitled to a license under all inventions first reduced to practice under a Government contract, defendant argues that it is entitled to a license under claims 1, 2, 3 and 5. Second, the Government contends that the claims are invalid because the invention was on sale within the meaning of 35 U.S.C. § 102(b) more than 1 year before the filing date of the application which ultimately matured into the patent in suit. To this second defense, plaintiff responds that its activities were for experimental purposes and thus not "sales" within the meaning of 35 U.S.C. § 102(b).[2]

As shown hereinbelow, the gas-driven, counterrotating swashplate engine includes a fluid seal assembly 166. Also shown is fluid inlet valve 176. The housing, generally shown by the numeral 12, is connected with shaft 16 for rotation in a first direction. In addition, pistons 146, which are connected to swashplate ring 112, rotate with the housing. Swashplate cam 98 is not only attached to shaft 22, but is also attached by ball bearings to swashplate ring 112. Shaft 22, cam 98 and fluid inlet valve 176 rotate in a direction opposite to the rotation of housing 12 and shaft 16. Briefly, as a result of a force displacing the pistons 146, rotational forces are imposed on swashplate ring 112, and swashplate cam 98, such that the swashplate cam and shaft 22, as well as a propeller which is attached thereto, will rotate in one direction, while swashplate ring 112, housing 12, shaft 16, and a second propeller which will be attached thereto, rotate in the opposite direction.

[See following illustration]

---

1. It should be noted that counsel for plaintiff and the Navy met during the pendency of the Hamlin patent application and worked out a split license agreement. The agreement gave the Government a license under all claims except those which in the issued patent became claims 1, 2, 3, 5 and 11, the rights to these claims being retained by Clevite alone. While

plaintiff's original petition urged infringement of claims 1, 2, 3, 5 and 11, plaintiff has since withdrawn its charge with regard to claim 11.

2. Since a decision on the "on sale" defense is dispositive of the entire case, there is no reason to consider, discuss, or decide any of the other issues raised by the posttrial briefs.

FIG.2

---

## The Claims

The claims in issue, in indented form for ease of understanding, provide:

1. A barrel engine comprising:
first and
second rotatable means
    coaxially mounted and constructed and arranged for counter-rotation;
    fluid pressure inlet means positioned coaxially with respect to said rotatable means for introducing fluid pressure into said engine;
    motive power means including
    a plurality of pistons reciprocatively mounted having their stroke axis parallel to the axial center of rotation, said motive power means being constructed and arranged to translate the fluid pressure into an axial force component;
    means for converting the axial force component into an angular force component
    and to exert the latter upon both of said rotatable means whereby said first rotatable means rotates in one direction and said second rotatable means rotates in opposite direction solely by virtue of the reaction to the rotation of the first rotatable means; and

means for connecting both of said rotatable means to individual work absorbing loads.

2. A barrel engine comprising:
first and
second rotatable means
    coaxially mounted and constructed and arranged for counter-rotation;
    fluid pressure inlet means positioned coaxially with respect to said rotatable means for introducing fluid pressure into said engine;
    motive power means including
    a plurality of pistons reciprocatively mounted having their stroke axis parallel to the axial center of rotation, said motive power means being constructed and arranged to translate fluid pressure into an axial force component;
    cam means in engagement with said pistons for converting the reciprocating motion of said pistons into rotary motion, said cam means being fixedly mounted to one of said rotatable means for causing the latter to rotate in one direction and solely by virtue of the reaction to this rotation causing the other rotatable means to rotate in opposite direction; and

means for connecting both of said rotatable means to individual work absorbing loads.

3. A barrel engine according to claim 2, wherein said cam means is constituted by a swashplate means fixedly mounted to one of said rotatable means

\* \* \* \* \* \*

5. A barrel engine comprising, in combination:

first and

second rotatable means

coaxially mounted and constructed and arranged for counter-rotation;

fluid pressure responsive means structurally associated with said first rotatable means and providing a conduit connectable to a source of fluid fuel, said responsive means including a plurality of pistons having their stroke axis parallel to the common axis of the rotatable means and effective to translate fluid pressure acting upon the pistons into an axial force component;

swashplate means fixedly mounted to said second rotatable means and co-operatively arranged with respect to said fluid responsive pressure means to translate the said axial force component into an angular force component and to exert the latter upon said second rotatable means to rotate same in one direction and causing said first rotatable means to rotate in the opposite direction;

a fluid inlet valve connected to and rotatable with said second rotatable means and in flow communication with said conduit of said fluid pressure responsive means and effective to control the fluid flow between the conduit and the source of fuel; and power take-off means secured, independently, to

each rotatable means for rotation in unison therewith.

As mentioned hereinabove, defendant contends that it has a license to use the inventions covered by the claims in suit because they were reduced to practice by plaintiff in the performance of work as either a prime or subcontractor under a Government contract. Plaintiff, to the contrary, argues that the inventions covered by the claims in suit were reduced to practice in November 1955, long before any work by plaintiff on a Government contract, at plaintiff's own expense, and that defendant is thus not entitled to a license thereunder.

Defendant counters by contending that if plaintiff is correct the claims are invalid because the inventions covered thereby were in "public use" or "on sale" within the meaning of 35 U.S.C. § 102(b) for more than 1 year before the October 1960 filing date of the Hamlin patent. Plaintiff disagrees, contending instead that its activities with regard to the Hamlin engine were permitted under the experimental use exception to 35 U.S.C. § 102(b). In sum, plaintiff, in order to prevail, must, *inter alia,* prove that the claims in suit were not only reduced to practice before the earliest Government contract, but that its activities more than 1 year prior to the Hamlin filing date for a patent are permitted under the "experimental use" exception to the 35 U.S.C. § 102 "on sale" bar.

In order to meaningfully deal with the issues, it becomes necessary to set out an observation or two that the parties have either purposely ignored or confused. To begin, the Hamlin patent contains claims that are directed to at least two categories of inventions. For convenience, the claims can be divided into a first category, which covers the broad or basic invention and includes all of the claims involved in this action;[3] and a second category, which covers the improvement inventions and includes all of the claims under which defendant is admittedly licensed. This division is based upon and supported by the acts of the parties. At the very least, support for the above division is found in an agreement reached by the parties long prior to this litigation. Particularly, on April 27, 1964, Dr. Edward E. Sachs, a patent attorney for plaintiff, and Mr. L. M. Holloway, a patent attorney for the Bureau of Naval Weapons,

---

**3.** As well as claim 11, which plaintiff has withdrawn from this action.

met to negotiate an agreement covering the claims of the patent in suit under which defendant was to be granted a license. The parties agreed, as a later executed license agreement reflects, that defendant was to receive a license under all claims of the patent in suit that were reduced to practice by plaintiff in the performance of Government contracts. Defendant was purposely not licensed under the claims involved in this suit because, as Mr. Holloway's memo of May 13, 1964, states:

> The basic engine was developed by Clevite Corp. between 1953 and 1956 and was a gas operated engine, i. e., compressed air, etc.[4]

It is also important to keep in mind that each claim of a patent is a separate and distinct invention. It is thus possible to discuss and deal with one or more of the claims independently and distinctly from the entire group of patent claims. *See Smith & Griggs Mfg. Co. v. Sprague,* 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141 (1887); *Hall v. Macneale,* 107 U.S. 90, 96, 2 S.Ct. 73, 27 L.Ed. 367 (1882). It, accordingly, follows that one or more of the claims may be "on sale" or in "public use" without the inventions covered by the remainder of the patent claims being similarly "on sale" or in "public use."

### On Sale

Title 35 U.S.C. § 102(b) provides in pertinent part that:

> A person shall be entitled to a patent unless—
>
> \*     \*     \*     \*     \*     \*
>
> (b) the invention was \* \* \* in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States \* \* \*

Hamlin's patent application was, as previously mentioned, filed on October 5, 1960. Accordingly, the activities of plaintiff prior to October 5, 1959, are of vital importance to a resolution of defendant's charge that the Hamlin patent is invalid because the invention was "on sale" in this country.

The activities of plaintiff complained of began with an August 26, 1958, offer by Clevite to sell Aerojet six barrel engines in accordance with Aerojet Drawing No. 0-056050 and Specification No. AGC 10003. The contract called for payment, on a cost-plus-fixed-fee basis of $147,044.06, of which $9,619.71 covered the fixed fee. The price was further broken down to $109,246.26 to cover the design, development, testing, documentation and reporting, and a portion of the fixed fee; $31,795.92 for six engines and spares for 25 runs and workshop equipment, including a portion of the fixed fee; and $6,001.88 to recover engineering assistance at Aerojet, along with the balance of the fixed fee.

The Aerojet specification required the Clevite barrel engines to operate at a higher horsepower, 90 ± 5 and at a depth or back pressure of 50 ± 10 p. s. i. The engines called for by the prior contracts between plaintiff and defendant operated at a lower horsepower and at a reduced back pressure.

Aerojet issued purchase order OP 226139 on September 15, 1958, accepting the Clevite offer. The purchase order required Clevite to furnish six engines, complete documentation, engineering assistance, and the design, development, fabrication and installation of six hydraulic pumps at a nonitemized, total cost of $162,044.06. Delivery of the first engine was to be made on April 1, 1959.

Speaking to the status of the Clevite engine, the December 1958 Aerojet test report which covered the period October 26 through November 25, 1958, states:[5]

> The design of the larger-displacement Clevite engine has been finished and a

---

4. *See Eastern Rotorcraft Corp. v. United States,* 397 F.2d 978, 983, 184 Ct.Cl. 709, 719–20 (1968), where a similar memorandum was admitted into evidence and used in forming the court's findings of fact.

5. Plaintiff's Ex. 165, at 12.

prototype engine built. Two runs on normal propyl nitrate (NPN) fuel were observed by Aerojet personnel at Clevite, and there were no signs of damage when the engine was disassembled following the run.

The testing of the Clevite engine was done under the exclusive control of Aerojet, although a Clevite representative was present during the tests. The tests uncovered problems with the engine cooling system, piston O-ring failure, hot gas seal, and scoring of the cylinder walls and valve seats.

Following the testing of at least one of the engines, Aerojet requested a price quote for two additional engines from Clevite. On May 12, 1959, Clevite quoted a price and a portion of a fixed fee of $2,530 for two additional pumps; $3,210 for material and design obsolescence and a portion of the fixed fee; $10,200 for two additional engines and a portion of the fixed fee; and $318.12 for miscellaneous seal and valve items as well as the remainder of the fixed fee.

By way of a change order of August 19, 1959, to purchase order OP 226139, Aerojet accepted Clevite's offer to sell two engines. The change order increased the number of Clevite engines to be delivered to Aerojet from six to eight, and, as well, increased the contract price by $10,200, from $162,044.06 to $172,244.06. Clevite agreed to deliver the additional two engines to Aerojet by October 20, 1959.

In the meantime, and specifically on or around July 1, 1959, the Clevite barrel engine was selected as the propulsion system for the Mk 46 Mod 0 torpedo over three other proposed propulsion systems by a technical advisory group which supervised Aerojet's work under its Government contract.

Shortly thereafter, on July 23, 1959, representatives of the Navy, Aerojet and Clevite met to discuss the production of 30 more barrel engines. Since these engines were to differ in some respects from the previously-ordered engines, they were designated by the parties as "Lot B" engines to distinguish them from the previously supplied eight "Lot A" engines. The more significant differences were: [6]

a. The diameter of the hot-gas seal was reduced to lessen the load that had been excessive for the material used.

b. The length of the hot-gas seal was reduced so the seal would seat properly on the valve face, thus preventing the outer edge of the carbon insert from being spalled.

c. The top piston O-ring was replaced with two machined-Teflon rings because rubber O-rings were impractical due to the inadequate lubrication and high-temperature conditions.

d. The copper-impregnated carbon seat was replaced with a silver-impregnated carbon seat to reduce the combustion-gas erosion of the seat.

e. The rubber O-ring seal on the valve seat was replaced with a Teflon O-ring because of the rapid deterioration of the rubber and the resultant leakage of combustion gases.

f. The clearance between the pistons and cylinder was increased in order to counteract the thermal expansion of the pistons during extreme-depth conditions.

g. A shroud was placed around the cylinder head so that cooling water could be directed over it.

While the above activities were going on, and particularly on July 3 and 20, 1959, Aerojet requested price quotations from Clevite for production quantities of the barrel engine. Clevite responded by letter of September 10, 1959, quoting prices. However, in marked distinction and contrast from the previous bids which were made on a cost-plus-fixed-fee basis, the September 10, 1959, bid from Clevite was for firm fixed prices on quantities of engines ranging from 10 to 2,500. The prices ranged from $4,400 per engine in quantities of 10, to $1,800 per engine if the order was for quantities of 2,500 or more. The bid ex-

6. Plaintiff's Ex. 176, at 21.

plained that the barrel engines would meet the yet-to-be-established performance requirements of NOrd Specification OS 8169. This specification was expected to be published by the end of October 1959. Moreover, Clevite's September 10, 1959, bid stated that the start of delivery of the Lot B-type barrel engines could be expected by Aerojet within 90 days after the issuance of the final specifications. It is significant to emphasize that the prices quoted by Clevite to Aerojet on September 10, 1959, related solely to the cost for production of engines and did not include research and development costs.

Around September 1959, as a result of problems encountered during the testing of the engines, Aerojet decided to return all of the Lot A engines to Clevite for modification of the following parts: [7]

1. Hot gas seal.
2. Water control orifice.
3. Valve inserts.
4. Cylinders, new plain steel.
5. Pistons, revise clearance dimensions at top and revise top groove.
6. Teflon rings.
7. Ports in head, drill out to $5/16$ and radius edge.
8. Spacer retainer crankcase seal, new piece.
9. Water seal forward end, modify.
10. Shroud for head, make new.
11. Special bolts for crankcase cooling, make new.
12. New valve with modified hole arrangement.
13. Plug holes in B 20284 Sleeve
14. Housing sleeve B 20363 remove and turn in place.
15. Pump housings, modify.
16. Water pump gearing, replace.

The Lot A engines were to be returned to Aerojet within 8 weeks, and, in fact, an engine having the above-indicated modification was returned on November 5, 1959.

Merely for purposes of completeness, it should be added that still another purchase order, OP 278343, was issued by Aerojet for the purchase of 42 Lot B-type swashplate engines after October 5, 1959.

While not expressly conceding that "a sale" of the Hamlin engine occurred prior to the critical October 5, 1959, date plaintiff's September 3, 1976, posttrial brief, at p. 43, appears to place more emphasis on the fact that:

[F]rom the date of reduction to practice of the Clevite engine in June and November 1955 until long after October 5, 1959, any uses and sales of the Clevite engine fall within the experimental use exception to 35 USC § 102(b).

Plaintiff, in support of its argument, stresses that Navy contract NOrd 16753 of January 17, 1956, and, as well, Navy contract NOrd 17826 of May 28, 1957, both involved experimental design, development and testing of the barrel engine. More accurately, Navy contract NOrd 16753 was specifically intended to: [8]

*Design and develop* a light weight, high speed, low cost, antisubmarine torpedo of the Mark 43 Mod 1 type having the following characteristics:

\* \* \* \* \* \*

(9) Power plant

(a) For propulsion—dry monopropellant such as Aerojet AN 2091 with Clevite Swash-plate engine

\* \* \* \* \* \*

Fabricate two (2) torpedoes complying with the above characteristics \* \* \*.

The above work shall be performed in phases as follows:

*Phase (A)—Design, develop, fabricate, and test* the propulsion and steering system

*Phase (B)—Design, develop, fabricate, and test* the complete torpedo system

---

7. Defendant's Ex. 100.

8. Plaintiff's Ex. 129.

incorporating the developments of Phase (A).

Plaintiff points out that: [9]

Although the Clevite engine had been successfully operated on an expanding gas from a liquid monopropellant fuel (NPN) and from a gaseous fuel (compressed nitrogen), it had not previously been operated on an expanding gas from a solid monopropellant fuel.

Based on the above premise and looking for support to various progress reports submitted under contract NOrd 16753, plaintiff concludes that: [10]

[M]any problems were encountered in "marrying" the Clevite engine to the solid monopropellant fuel.

Plaintiff stresses the problems it encountered in the valve design and materials, and cooling of the engine.

Similarly, plaintiff contends that Navy contract NOrd 17826 was awarded for the purpose of: [11]

[C]ontinuing the development of the Clevite barrel swashplate engine, and in particular to design and develop an engine capable of developing approximately 75 horsepower * * *.

With regard to its work under the Navy contract to Aerojet, plaintiff emphasized that the September 15, 1958, purchase order required Clevite to: [12]

Design, development [sic], fabricate and test six (6) Clevite engines to Dwg. 0–056050 N/C and Aerojet-General Corporation Spec. 10003 * * *.

 *    *    *    *    *    *

[F]urnish, as may be required, engineering assistance, not to exceed 150 man-hours effort, to buyer [Aerojet] at its plant * * *.

After tracing the chronology of work done under the Aerojet purchase orders and emphasizing the necessity of returning all Lot A engines, as explained hereinabove, for modification, plaintiff urges: [13]

Thus Clevite's experimental design, development and testing of the engine both as an Aerojet subcontractor under Purchase Orders OP 226139 and OP 278343 and as a direct Navy contractor under Contract NOrd 17826, continued long after October 5, 1959.

Before proceeding with a resolution of the "on sale" issue, mention should be made of the legal tightrope, upon which plaintiff is balanced. While briefly alluded to hereinabove, it is necessary to flesh out the legal quagmire so that the parties' arguments may be better understood.

On the one hand, plaintiff, in order to have title to the claims at bar, must show that a reduction to practice of the inventions covered by the claims occurred before January 17, 1956, when plaintiff was awarded the NOrd 16753 contract. On the other hand, plaintiff must explain away what defendant has characterized as "sales" more than 1 year before its October 5, 1960, filing date of the Hamlin patent. In its explanation, plaintiff resorts to the "experimental use" [14] exception to justify what might otherwise be proscribed as a sale under 35 U.S.C. § 102(b). However, in so doing, it seems that plaintiff also runs the risk of convincing the court that an actual reduction to practice of the claims at bar did not occur prior to its work under the Government contracts, but rather that the reduction to practice occurred during what it now chooses to label as experimentation work as either a prime or subcontractor of defendant. If the latter is true, defendant would, of course, be entitled to a license under the claims in suit.

---

9. *See* plaintiff's posttrial brief of September 3, 1976, at 44.

10. *Id.* at 45.

11. *Id.* at 46.

12. *See* plaintiff's Ex. 138.

13. *See* plaintiff's posttrial brief of September 3, 1976, at 52.

14. The experimental use exception was recognized by the Supreme Court in the case of *Elizabeth v. Pavement Co.,* 97 U.S. 126, 24 L.Ed. 1000 (1877).

While under different circumstances, it may have been necessary to exactly establish the date of plaintiff's reduction to practice of the claims at bar, for reasons which will become clear hereinafter, the exact reduction to practice date is not essential to a decision of this case. Specifically, since the "on sale" bar is adequate to dispose of the case, it is sufficient to observe that both plaintiff and defendant agree that claims 1, 2, 3 and 5 were actually reduced to practice at least by July 1958.[15] July 1958 is, of course, prior to any of the "on sale" activities which defendant argues invalidate the claims in suit.

Before considering the "on sale" arguments of the parties, Chief Judge Caleb M. Wright's observations in the case of *Philco Corp. v. Admiral Corp.,* 199 F.Supp. 797, 815 (D.C.Del.1961), warrant repeating:

> The cases dealing with § 102(b) of the Patent Act are in a state of confusion resulting in part from an attempt to establish hard and fast rules of law based upon overly refined legal distinctions. The area sought to be governed by these rules, however, encompasses an infinite variety of factual situations which, when viewed in terms of the policies underlying § 102(b), present an infinite variety of legal problems wholly unsuited to mechanically-applied, technical rules. The "in public use or on sale" rules as applied to the independent craftsman who constructs a product to order, for instance, may lead to an absurd result when applied to an integrated, mass production industry with highly organized merchandizing systems. The question of what is experimentation and what is not may also take on a different complexion depending on the character of the device, the nature of the industry, and the facilities available to the particular inventor.

It appears certain that the purpose of the on sale bar and the 1-year grace period is an attempt by Congress to balance the interests of the inventor with the interests of the public. On the one hand, Congress was concerned that an inventor would have sufficient time to not only determine whether a patent is desired following a sale, but that sufficient time would also be provided to have the patent application prepared and filed in the Patent Office. On the other hand, Congress was concerned with encouraging inventors to file for a patent as soon as possible and, at the same time, prevent the commercial exploitation of an invention as a trade secret for more than 1 year. *See Metallizing Engr. Co. v. Kenyon Bearing & Auto Parts Co.,* 153 F.2d 516, 518 (2d Cir. 1946).

The range of situations proscribed by the "on sale" clause of 35 U.S.C. § 102(b) varied. For example, in *Chicopee Mfg. Corp. v. Columbus Fiber Mills Co.,* 165 F.Supp. 307 (M.D.Ga.1958), the showing of samples of a new automobile seat cover fabric to various automobile manufacturers before the 1-year grace period was legally sufficient to place the invention on sale. It correctly made no difference to that court that production quantities of the fabric were not in existence at the time of the showing.

Similarly, a sale, more than 1 year before the filing of a patent application and pursuant to a secret military contract, of a valve for a classified missile was still held to be a sale proscribed by 35 U.S.C. § 102(b). *Piet v. United States,* 176 F.Supp. 576 (S.D.Cal. 1959), *aff'd,* 283 F.2d 693 (9th Cir. 1960).

These cases generally recognize the interest of courts to prevent an inventor from commercially exploiting his invention for any amount of time beyond the 1-year grace period authorized by Congress. *See Philco Corp., supra,* 199 F.Supp. at 816.

The same concern exists in this case. Plaintiff dismisses defendant's "on sale" arguments regarding the Lot A engine and the Clevite bid of September 10, 1959, which quoted prices on quantities of from 10 to 2,500 engines on the same experimental use exception. Plaintiff's argument, of course, ignores the commercial use which

---

**15.** Whereas plaintiff alleges an actual reduction to practice of the claims in suit by November 1955, defendant argues that it occurred on or about December 10, 1957.

each of the complained of activities clearly amount to. But, equally significant, for reasons which will be more fully explained hereinbelow, plaintiff's argument also ignores the plethora of evidence that points away from plaintiff's experimental use defense.

In addition, plaintiff's arguments appear to be grounded upon the mistaken notion that only one invention is covered by the Hamlin patent. In fact, as has been previously explained, there are at least two categories of inventions: i. e., those reduced to practice before any of the Government contracts were awarded; and those reduced to practice under the Government contracts. Of course, the fact that improvement inventions were reduced to practice by Hamlin during the Government contract in no way affected the invention that plaintiff had earlier reduced to practice. That this is so is the only reasonable explanation as to why both plaintiff and defendant were willing to agree that defendant was licensed under all claims of the Hamlin patent, except the claims in suit. Specifically, the May 13, 1964, memorandum to file by Mr. Holloway explains:

1. A conference was held 27 April 1964 with Mr. Edward Sachs, Patent Counsel of Clevite Corp., to discuss the allowed claims in patent application Serial No. 60,746. The discussion involved clarification of the particular claims in which the government was entitled to a license.
2. Patent application Serial No. 60,746, entitled "Engine Unit" is for a gas wobble-plate engine which was redesigned and utilized by the Navy as a hot gas torpedo power plant. The basic engine was developed by Clevite Corp. between 1953 and 1956 and was a gas operated engine, i. e., compressed air, etc.
3. In 1956, Contract NOrd 16753, which was closed out in 1957, was initiated with Clevite Corp. to adapt the Clevite engine to utilize a solid propellant. As a result, certain inventions were made in the engine in adapting it for a solid fuel, primarily a "Rotary Valve," and a "Rotary Seal" and they were incorporated in the engine. These inventions were also included in the patent application that was filed to cover the basic engine.
4. During the conference, it was determined that allowed claims 23, 32 through 36, and 39 claimed the two inventions as part of the basic engine structure. Claim 38 was in a doubtful category, however, Clevite agreed to include it under the license. The remaining 5 allowed claims were drawn to Clevite's basic engine.
5. A split license agreement appeared to be the best solution to this situation. An attempt to file an application containing only the claims to which the government had rights would undoubtedly have resulted in a rejection of double patenting. Further, it is doubtful of what, if any, patent protection could have been obtained from filing applications covering only the "Rotary Valve" and "Rotary Seal". Accordingly, a license is being submitted by Clevite covering the claims cited.

That plaintiff was not involved in an experimental use of the invention covered by the claims at bar is further evidenced from a review of the type of work which was being done under the Government contracts.

Plaintiff's work under the Government contracts was concerned primarily with scaling-up the barrel engine, establishing its operating characteristics, and making minor changes to improve its efficiency.

At the previously referred to July 23, 1959, meeting, the participants agreed that Clevite would conduct additional tests on the following engine characteristics:

1. Horsepower, depth, speed
2. Vibration
3. Shock and acceleration
4. Depth
5. Humidity
6. Tropical atmosphere
7. Shelf life
8. Accessory integration
9. Post-run handling

All of these tests are indicative of a final analysis of a completed invention, rather than a search for additional modifications or improvements in the basic design of the engine.

Moreover, Clevite was to do some work on "design and development of [the] engine," which was defined further as:

1. Engine evaluation test
2. Valve and O-ring improvement
3. Grain (solid propellant) compatibility tests

The design work which was actually carried out after July 1959, primarily produced changes in the materials from which certain engine components were made. For example, the rubber O-rings on the pistons and valve seat were replaced with Teflon rings, and the copper-impregnated carbon valve seat was replaced with a silver-impregnated carbon valve seat.

Other changes made as a consequence of the tests done by Aerojet and Clevite included reducing the diameter and length of the hot gas seal, increasing the piston-cylinder clearance, and several changes in the water circulating (cooling) system.

Thus, the work done was not directed toward the invention covered by the claims in suit, the overall engine configuration, but was directed toward scaling-up the engine and checking and adjusting the performance of component parts. The work which was done and those changes which were made related to details of components not specifically recited or necessary to the invention covered by the claims in suit.

Further evidence that the plaintiff was not concerned with conducting experiments on the invention covered by the claims in suit appears from the plaintiff's own evaluations of the Hamlin engine. Statements by plaintiff's general manager unequivocally establish that the design of the Hamlin engine was a demonstrated fact by at least July 3, 1958. Particularly, Clevite's general manager, on April 2, 1958, wrote a letter to the Navy, stating:

*The engine program is now involved with clean-up details*, such as optimum water diluent, and optimum repackaging for minimum size and weight. A six cylinder unit with captive pistons substantially shorter and lighter than the present unit is being built. Two modifications in valve design aimed at increased efficiency and ease of assembly are being built. *There is nothing of major import. The engine design has demonstrated capacity to meet its design requirements.* [Emphasis added.]

Again on July 3, 1958, Clevite's general manager wrote to the Navy to more emphatically declare that the inventive goals of the engine had been met, stating:

*The engine design is now a demonstrated fact.* A resume of the progress during this past month is enclosed as attachment (1). Detailed results of the past period have been reported in the formal reports. Work is continuing to improve its mechanical and thermodynamic efficiency to minimize fuel consumption. [Emphasis added.]

Plaintiff's experimental use argument is made even more tenuous from its insistence that a reduction to practice of the claims at issue occurred prior to its January 17, 1956, NOrd 16753 contract with defendant. As is true with most areas of patent law, cases are available to support divergent and often contrary views regarding the facts necessary to establish a reduction to practice.

■ The nature of the invention often is an important factor in determining if an actual reduction to practice has occurred. For example, in *Mason v. Hepburn*, 13 App. D.C. 86, 89 (1898), the court stated:

■ome devices are so simple, and their purpose and efficacy so obvious, that the complete construction of one of a size and form intended for and capable of practical use might well be regarded as a sufficient reduction to practice, without actual use or test in an effort to demonstrate their complete success or probable commercial value.

In an attempt to bring practicability and realism into an area in which the courts had previously been content to deal in generalities and overly technical considerations, Judge Learned Hand, in *Sinko Tool & Mfg. Co. v. Automatic Devices Corp.*, 157 F.2d 974, 977, 71 USPQ 199, 202 (2d Cir. 1946), concluded:

[A] test under service conditions is necessary in those cases, and in those only, in which persons qualified in the art would require such a test before they were willing to manufacture and sell the invention as it stands.

In the case at bar, both the plaintiff and the inventor Hamlin were experienced in the art of torpedoes. The record establishes that Hamlin was in November of 1955 satisfied that the invention covered by the claims at bar was complete and operable. While he did recognize that the *engine did not operate at maximum horsepower*, and that other requirements might be imposed by the Navy, nonetheless, he appeared confident that the engine would operate to perform its intended purpose.

It is, of course, necessary for an invention to proceed through various stages of development. To begin, the inventor must have a conception of the invention. This requires a formation in the mind of the inventor of a definite and fixed idea of the complete and operative invention which will later be reduced to practice. *Fields v. Knowles*, 183 F.2d 593, 611, 37 CCPA 1211 (1950). Next, the device is built. After the invention has been built, the inventor (except in those instances of which I previously spoke where because of the simplicity of the invention or because of the certainty of the inventor that the invention can be manufactured and sold as it currently exists) conducts tests needed to convince himself that the invention is capable of performing its intended purpose in its intended environment. This latter stage permits, *inter alia*, the experimental use necessary to satisfy the inventor of the merits of the invention. Then, and only then, an actual reduction to practice of the invention occurs.

Judge Thornberry, in the case of *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 279, 183 USPQ 65, 70 (5th Cir. 1974), *cert. denied sub nom. Sauquoit Fibers Co., Inc. v. Leesona Corp.*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974), in a particularly exhaustive treatment of the subject of actual reduction to practice, put it thusly:

The American "reduction to practice," however, is not achieved until the inventor has sufficiently tested the prototype to prove its utility and to determine that no further refinements are necessary.

Continuing with his decision, Judge Thornberry states, 498 F.2d at 280, 183 USPQ at 71:

As a legal term of art, however, "reduction to practice" includes not only this reduction to reality [building of a model of the invention] but also sufficient testing or experimentation to demonstrate that the device as it exists possesses sufficient utility to justify a patent, i. e., that the invention is suitable for its intended purpose.

\*   \*   \*   \*   \*   \*

Thus the legal definition of the date of reduction to practice appears to equate it precisely with the end of the experimental period for the purpose of § 102(b).

A detailed review of the precontract work by plaintiff is not necessary in this instance since regardless of whether plaintiff's date of November 1955 or defendant's December 10, 1957, date for a reduction to practice is correct, it appears beyond dispute that the experimental use period as explained by Judge Thornberry was over by the time that plaintiff's "on sale" activity of August 26, 1958, August 19, 1959, and September 10, 1959, took place. On the other hand, it should be noted that if plaintiff was doing more than a "mere cleaning up of detail" after November 1955, plaintiff may be incorrect in its assertion of a reduction to practice of the claims in suit before its work on the first Government contract. Defendant, under such circumstances, may be entitled to a license under the claims.

Having failed, for all of the above reasons, to establish the experimental use of the Hamlin engine, it is concluded that plaintiff's August 1958 offer and subsequent delivery of six engines, the August 1959 offer and subsequent delivery of two engines, and the September 1959 offer in production quantities on a fixed-price basis of engines to Aerojet, clearly constitute

sales within the meaning of 35 U.S.C. § 102(b). *See Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859, 869, 173 USPQ 295, 302 (D.C.Del.1972), where the court stated:

> When an invention is offered for sale more than a year before the patent application is filed, it is "on sale" within the meaning of 35 U.S.C. § 102(b), even if an actual sale has not occurred. This is true, even when (a) but one offer has been made to but one customer; (b) the prices are only estimated rather than established; (c) no commercial production runs have been made; and (d) the alleged invention is never sold.

### CONCLUSION

In sum, it is concluded from, *inter alia*, an analysis of the work performed by plaintiff after January 17, 1956, plaintiff's own arguments regarding a complete reduction to practice of the claims in suit, and the remarks made by plaintiff's general manager, that the inventions covered by claims 1, 2, 3 and 5 were "on sale" within the meaning of 35 U.S.C. § 102(b) for more than 1 year prior to the October 5, 1960, filing date of the Hamlin patent. Claims 1, 2, 3 and 5 are thus invalid. Accordingly, plaintiff is not entitled to recover and its petition is dismissed.

NICHOLS, Judge, dissenting:

Respectfully, I dissent.

The question that divides the panel and me is whether certain sales and offers for sale of the patented invention, more than one year before the application, invalidate the patent or are excused by the experimental use doctrine. In that regard, I note that the panel is deleting a sentence in the trial judge's recommended opinion which reads—

> Plaintiff's arguments that a reduction to practice can occur before an experimental use period has been completed is unpersuasive and contrary to logic and the law.

I agree with this deletion, I think it is fairly clear or at least arguable, from Judge Thornberry's recent able and exhaustive treatment of the experimental use exemption, that public use or sale more than one year prior to the patent application will be excused, even after the invention could be deemed reduced to practice in the "legal sense," if experimentation is still going on that is reasonably necessary "to determine whether further refinement is needed." *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 285 (5th Cir.), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974). This seems to me to stand to reason. Experimentation adequate to test for utility or to complete the invention itself may well necessarily precede reduction to practice "in the legal sense," but experiments of broader purpose can occur later. The purpose of the experimental use exception is to avoid rushing the inventor to the Patent Office when the invention still needs further experiment, with the result that he will be cheated out of part of the period of monopoly exploitation allowed him by law, and, also, I should think, the waste of Patent Office resources in processing halfbaked inventions should be considered. These purposes are frustrated if the need for further experimentation of any kind stands in the way of prompt exploitation yet does not toll the running of the one year period for filing. There might be instances of a linkage in a buyer's mind, that led him to delay exploitation to await the result of experiments having nothing to do with the invention at issue. Thus an automobile manufacturer might delay incorporating a newly invented carburetor in a new model car, pending experiments with a new steering gear scheduled for the same model. That is not this case, and need not detain us. Here the experiments were with the very same "barrel engine" that is the subject of the patent, whose invalidity is asserted.

The connection of experiments with the invention must be evaluated in light of the surrounding circumstances. Here we have a new propelling mechanism for torpedoes, weapons of naval warfare. If there is any possible customer except the U.S. Government, the existence of such other is not suggested by the findings. The U.S.

Government, though impressed with the invention, was unwilling to accept it for operational use without a solid propellant, whereas the inventors had developed it with a liquid propellant. Until these hesitations were resolved, the invention was unmarketable. In the circumstances, in my view, these were necessary experiments.

I note that the trial judge quotes from Judge Thornberry a passage from 498 F.2d at 279 and two at 280. The latter two he separates by stars to denote an omission. They are in the original widely separated and without logical connection with one another. At p. 281 Judge Thornberry says flatly:

> Numerous cases, however, have explicitly extended the experimental period past the point of reduction to practice.

He employs the technique of stating apparently conflicting lines of cases and reconciling them to support his own position. · A Canadian court had fixed a "date of invention" for the purpose of comparison with prior art. Judge Thornberry holds this lacks collateral estoppel effect in his court because the date of "reduction to practice" under our law comes later on typically, than the Canadian concept of date of invention under their law. Whether "reduction to practice" does or does not end the effect of experimentation as tolling the one year period for filing, was not really necessary to decide the issue before him, because the date of "reduction to practice" was itself fluid and in issue, unlike here. But I read him at p. 285 as finally concluding that experimentation after the date of reduction to practice could still qualify, when it did not operate to postpone the date of reduction to practice itself.

The court will say, I suppose, that the experiments here involved do not toll because they related to another invention, not the one sued on. This analysis would distinguish between claims 1, 2, 3, and 5, sued on here, and other claims under the same patent. The latter group embody the results of the experiments here at issue, and are not in litigation, because the experiments were performed under government contracts and therefore defendant enjoys a royalty free license. You can, therefore, if you like, view the experiments as conducted towards the perfection of another invention. If, however, the experiments had been unsuccessful—and, antecedently considered, it is always possible for an experiment to fail—they would have tended to demonstrate that the embodiment claimed on in claims 1, 2, 3, and 5 was the best achievable. If the Navy had then terminated the experiments, and bought the previous embodiment for operational issue to ships and planes, I do not think the panel would hesitate to say the experiments had served to test the original invention, and, therefore, the one year period had been tolled. Is it then true that the result of an experiment determines its legal effect in these premises? I do not think so. I think, whatever their outcome, experiments to determine whether an invention can be improved are the same thing as experiments to determine whether, in Judge Thornberry's phrase, "further refinement is needed." In the eyes of a customer such as the U.S. Navy, at least, if an invention can be improved, it must be improved, and in such circumstances "further refinement" is always needed. If Sears and Roebuck had been the customer, we might have a different case.

I do not attach much weight to an offer to sell engines according to specifications yet to be established. I view the whole course of transactions with the Navy and with Aerojet as ancillary to the conduct of experiments, which were to evaluate the invention and determine its best embodiment. Not a single torpedo engine embodying the invention was in the pertinent period sold or offered for sale for incorporation in an operational torpedo, for issue to an operational ship or plane. The time for commercial exploitation of the invention had not begun. Those facts to me are decisive.

Judge Thornberry's analysis of the cases reveals a dismaying state of conflict and confusion. We Massachusetts lawyers used to say that some decision of the Supreme

Judicial Court of the state could be cited on the wrong side of every issue, and so it is with the Federal cases in this area of Section 102(b). I cannot help seeing, as he does, some instances of almost willful laying of traps for the unwary. It may be we of the judiciary have an unconscious hostility towards the patent system. Our lives would certainly be easier if it did not exist. I know such motives are not at work in the majority decision here, but I cannot help thinking that, without so intending, the trial judge is adding another quagmire (as he calls it) to the many already lurking in this jungle. I would have preferred to clear out underbrush and open up solid land.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing trial judge's opinion which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that claims 1, 2, 3 and 5 of the Hamlin patent are invalid. Plaintiff is not entitled to recover, and its petition is dismissed.